Ex Parte Adrian **CHAVEZ**, Applicant.

No. AP–76,665.

Court of Criminal Appeals of Texas.

May 23, 2012.

Rehearing Denied June 20, 2012.

Randy Schaffer, Houston, for Appellant.

Lynn Hardaway, Asst. D.A., Houston, Lisa C. McMinn, State's Attorney, Austin, for State.

## OPINION

ALCALA, J., delivered the opinion of the Court in which MEYERS, WOMACK, JOHNSON, HERVEY, and COCHRAN, JJ., joined.

Applicant, Adrian Chavez, seeks relief from his fifty-five-year sentence for aggravated robbery. This is applicant's first subsequent application for a writ of habeas corpus. *See* TEX.CODE CRIM. PROC. art. 11.07, § 4. Applicant claims that a new legal basis that was previously unavailable when he filed his first habeas application entitles him to consideration of, and relief on, his due-process false-testimony claim. *See id.* § 4(a)(1). Although we find that applicant is not procedurally barred from raising his claim, we conclude that he has failed to establish a due-process violation

by the State's unknowing use of false testimony at his trial. We deny relief.

## I. Background

### A. Facts

In the early hours of July 1, 1997, a group of four or five men unlawfully entered a house by kicking in the door. The intruders wore bandanas over their faces, and at least two of the men carried guns. During the invasion, one of the armed men fatally shot Alex Parisi, an occupant of the home. The intruders stole drugs and money and fled the scene. Two of Parisi's roommates, Vernon Cameron and Christopher Lewis, were home that evening and witnessed the shooting. Both men identified the shooter as applicant. Cameron told police that the shooter pulled down his mask immediately after he opened fire on Parisi and that he recognized him as applicant. Lewis, who was also in the bedroom where Parisi was shot, said that he recognized applicant's voice and build. Cameron testified that he had met applicant on "many occasions," and Lewis testified that he had known applicant for years.

Applicant was charged with capital murder,[1] and the State introduced at trial, among other evidence linking applicant to the offense, Cameron's and Lewis's testimony. Applicant testified that he was at home asleep at the time of the offense. The jury found applicant guilty of the lesser-included offense of aggravated robbery.[2]

During the punishment phase, the State introduced evidence casting applicant in an unfavorable light, including evidence of his role as the primary planner of the offense;

---

1. Applicant was also charged with the lesser-included offenses of murder and aggravated robbery.

2. The trial court instructed the jury on the law of parties under Texas Penal Code section 7.02(a)(2), permitting the jurors to convict applicant of aggravated robbery if they believed he "solicit[ed], encourage[d], direct[ed], aid[ed], or attempt[ed] to aid" in the commission of the offense. *See* TEX. PEN.CODE § 7.02(a)(2).

testimony regarding his lack of remorse following the offense; his false testimony in which he denied participation in the offense; and a prior history of violent behavior and crime, including felony offenses he committed while on bond for the capital-murder charge in this case.

The following morning, after the jury had retired to deliberate, applicant admitted to his counsel, for the first time, that he had participated in the offense, but only as the driver of the getaway vehicle. Defense counsel arranged for applicant to meet with the prosecutor to provide the names of the other individuals who were involved in the offense "to see if it would in any way influence the ultimate disposition in terms of sentencing in this matter." During this meeting, however, the jury returned with a verdict assessing applicant's punishment at fifty-five years' confinement.[3] The trial court denied his motion for new trial, and his conviction was affirmed on direct appeal. *See Chavez v. State,* No. 14–98–00696–CR, 2000 Tex.App. LEXIS 3055 (Tex.App.—Houston [14th Dist.] May 11, 2000, pet. ref'd) (not designated for publication).

After applicant was convicted, the State's attorneys received what they considered to be credible information from two witnesses, previously unknown to the State, that two other men had admitted to perpetrating the offense, one of whom admitted to having shot Parisi. One of those men also stated that applicant had devised and coordinated the offense, and the other man stated that applicant remained in the getaway vehicle during the course of the offense. Both of those men pleaded guilty to, and were convicted of, aggravated robbery with a deadly weapon for this offense. Because of this post-trial discovered evidence showing that applicant was not in the house during the offense, applicant filed a writ of habeas corpus contending that the roommates' testimony identifying him as the shooter was false.

**B. Applicant's First Application for Writ of Habeas Corpus**

Applicant filed his first application for a writ of habeas corpus challenging the validity of his conviction and sentence in light of the newly discovered evidence of innocence, namely, that someone other than applicant was the shooter.[4] *See Ex parte Chavez,* 213 S.W.3d 320, 321 (Tex.Crim. App.2006) (*"Chavez I"*). The convicting court recommended a new punishment proceeding only, concluding that the "totality of the circumstances" undermined its confidence in the fifty-five-year sentence. *Id.* at 322. We, however, held that applicant was not entitled to relief under the actual-innocence framework or any other due-process principle then available. *Id.* at 321.

This Court analyzed applicant's claim using the rubric of actual innocence. *Chavez I,* 213 S.W.3d at 322. We acknowledged, however, that it was "odd to speak in terms of being 'actually innocent' of a particular punishment" that is within the statutorily provided range of punishment for an offense and considered whether applicant would be entitled to a new punishment hearing based on "any other principle of due process." *Id.* at 323. In discussing the applicability of any other due-process principle, this Court analyzed applicant's issue in the context of the State's failure to disclose "material

---

3. The statutory punishment range for aggravated robbery is 5 to 99 years' confinement. *See* TEX. PEN.CODE §§ 12.32 & 29.03(b).

4. Applicant also raised a Due Process claim based on either the knowing or "good faith" use of false testimony to obtain a conviction, but we did not file and set that claim and summarily denied it. *See Ex parte Chavez,* 213 S.W.3d 320, 326 n. 30 (Tex.Crim.App. 2006) (*"Chavez I"*).

exculpatory evidence" and determined that the record did not "reveal any act or omission on the part of the State or any of its agents that caused the applicant's sentencing jury to be misinformed about the true nature of his involvement in the offense." *Id.* at 324. We also observed that it was applicant's fault that the jury was misinformed because "he knew the true extent of his involvement in the offense" and "affirmatively misled his own counsel and chose to testify, apparently falsely, to an alibi in an attempt to escape criminal liability altogether." *Id.* at 325.

After considering various factors—including the State's and applicant's roles in supplying the misinformation, the witnesses' sworn statements that they would provide the same testimony in a new trial, and the fact of applicant's acquittal from capital murder and the lesser-included offense of murder—we concluded that applicant had failed to "unquestionably establish" that the jury was materially misinformed as to his involvement in the offense and denied relief. *Id.* at 326.

### C. Applicant's Second Application for Writ of Habeas Corpus

Applicant has now filed a subsequent application, in which he claims that a new legal basis warrants further review of his false-testimony claim. *See* TEX.CODE CRIM. PROC. art. 11.07, § 4(a)(1). He cites *Ex parte Chabot,* in which we explicitly held, for the first time, that admission of false testimony could violate an applicant's due-process rights, even when the State was unaware at the time of trial that the testimony was false. 300 S.W.3d 768, 772 (Tex. Crim.App.2009).[5] He argues that, now that a claim of unknowing use of false testimony is cognizable on habeas, the admission of Cameron's and Lewis's false testimony entitles him to a new trial on

punishment, despite that the State neither knew nor should have known that their testimony was false. The State responds that, assuming applicant's claim meets the new-legal-basis requirement and that the testimony is false, applicant fails to establish harm given that he was acquitted of the murder charges, citing our analysis in *Chavez I. See Chavez I,* 213 S.W.3d at 325–26.

In its findings of fact and conclusions of law, the trial court found that the new evidence "revealed that the applicant was not one of the shooters although he was an active participant in the planning and execution of the instant offense." It did not decide whether *Chabot* constituted a new legal basis under Article 11.07, Section 4(a)(1), but found that "even if the applicant establishes that the legal basis for his habeas claim was not available when" he filed his first habeas application, "the evidence does not establish that witnesses Cameron and Lewis intended to provide false testimony or that they thought their trial testimony was inaccurate." It further found that applicant failed "to demonstrate harm in light of the applicant's admission of involvement in the instant offense; the court's inclusion of a parties charge; and the jury's finding that the applicant was guilty of the lesser offense of aggravated robbery." It concluded, therefore, that applicant "has not established a violation of his due process rights based on the State's unknowing presentation of alleged perjured testimony" and recommended denying relief.

### II. Jurisdiction Over Subsequent Habeas Application with New Legal Basis

### A. Subsequent–Application Statutory Procedural Requirements

---

5. *See also Ex parte Napper,* 322 S.W.3d 202, 242 (Tex.Crim.App.2010) ("We have recently held that due process may be violated by a prosecutor's unknowing use of perjured testimony.") (citing *Ex parte Chabot,* 300 S.W.3d 768, 771–72 (Tex.Crim.App.2009)).

Under Texas law, this Court may not consider the merits of a subsequent application for a writ of habeas corpus unless the application satisfies one of two statutory exceptions. *See* TEX.CODE CRIM. PROC. art. 11.07, § 4. One such exception is applied when an application

> contains sufficient specific facts establishing that the current claims and issues have not been and could not have been presented previously in an original application or in a previously considered application filed under this article because the factual or legal basis for the claim was unavailable on the date the applicant filed the previous application.

*Id.* § 4(a)(1). In his initial application, applicant argued that "[e]ven if the State presented the false testimony in good faith, the due process/due course of law provisions of the United States and Texas Constitutions were violated." However, we did not address that argument and filed and set only his actual-innocence claim. Although we have never addressed his due-process false-testimony argument, the pertinent question in determining whether we may review applicant's subsequent application is whether *Chabot* constitutes a new legal basis that was unavailable at the time he filed his initial application. *See id.*

## B. *Ex parte Chabot* Explicitly Recognized Due–Process Claim of Unknowing Use of False Testimony

In *Chabot,* the State presented testimony of an accomplice witness who claimed that he was in another room when the applicant sexually assaulted and murdered the victim. *Chabot,* 300 S.W.3d at 770. Postconviction DNA evidence excluded Chabot and revealed that the accomplice witness had, in fact, perpetrated the offense. *Id.* However, there was no evidence that the State knew that the testimony was false when the State introduced it at trial. *Id.* at 771. We observed that, in cases involving the State's knowing use of false testimony in violation of due process, an " 'applicant has the burden to prove by a preponderance of the evidence that the error contributed to his conviction or punishment.' " *Id.* (quoting *Ex parte Fierro,* 934 S.W.2d 370, 374 (Tex.Crim. App.1996)). Although *Chabot* involved unknowing, rather than knowing, use of false testimony, we found "no reason for subjecting the two types of errors to different standards of harm." *Id.* Because the false testimony of the accomplice witness provided the only direct evidence that Chabot sexually assaulted and killed the victim, we concluded held that Chabot's "due-process rights were violated, notwithstanding the absence of the State's knowledge of the perjured testimony at the time of trial." *Id.* at 772.

*Chabot* was the first case in which we explicitly recognized an unknowing-use due-process claim; therefore, that legal basis was unavailable at the time applicant filed his previous application.[6] *See* TEX. CODE CRIM. PROC. art. 11.07, § 4(a)(1).

## C. Unknowing Use of False Testimony Not a Legal Basis for Relief in *Chavez I*

---

6. We do not reach harm in this case. We note, however, that

> there is an analytical difference that our opinion continues to respect: materiality is a component of the due process violation, and hence a component of the error, while harm is a separate inquiry. Viewed from that perspective, the *materiality* standard for perjured testimony remains what it has always been—the *Chapman* ["possibility"] test. But the *harm* standard on collateral review is the *Dutchover* ["probability"] test. *Ex parte Fierro,* 934 S.W.2d 370, 377 (Tex. Crim.App.1996) (citing *Chapman v. California,* 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 (U.S.1967); *Ex parte Dutchover,* 779 S.W.2d 76 (Tex.Crim.App.1989)).

In his first application, applicant claimed that new evidence shows that he is "actually innocent of entering the house and shooting the deceased" and, therefore, is entitled to either a new trial or new punishment hearing. In *Chavez I,* we observed that in order to obtain relief on a bare actual-innocence claim, applicant

> must satisfy an "extraordinarily high" standard of proof. He must "unquestionably establish" his innocence; that is to say, he must show by clear and convincing evidence that, presented with both the inculpatory evidence at trial and the newly discovered or available evidence of innocence, no reasonable juror would have convicted him.

*Chavez I,* 213 S.W.3d at 322 (citing *Ex parte Elizondo,* 947 S.W.2d 202 (Tex.Crim. App.1996)). We also considered whether any other due-process principle rendered the punishment proceeding "intolerably unfair" so to require a new one, "[b]orrowing ... from the due-process vernacular in the context of the suppression of exculpatory punishment evidence." *Id.* at 324–25. Namely, we examined whether "the sentencer's normative judgment" was "affirmatively misinformed" by the admission of the false testimony. *Id.* at 324.

We observed that, in the context of the State's failure to disclose material exculpatory evidence, "[m]alfeasance ... on the part of any member of the prosecution 'team' may be attributable to the State for due-process purposes," and noted that the misinformation in this case was not attributable to the State. *Id.* at 324–25. We also observed that, in that same context, "we have held that there is no due process violation under circumstances in which the defendant himself already knew about the exculpatory facts." We noted that had applicant disclosed his actual involvement sooner than he did, "counsel could have attempted to investigate the circumstances that corroborated the applicant's account" and "might have attempted to broker a plea bargain" to obtain a lesser sentence. *Id.* at 325. Because he did not and instead presented a false alibi, to the extent that the misinformation adversely affected his punishment, he was at fault. *Id.* We, therefore, concluded that applicant did not suffer an unfair punishment proceeding. *Id.*

We further decided that "new evidence that the applicant was not the actual shooter" was not "material" in this case. *Id.* Once more using language applicable to claims involving failure to disclose material exculpatory evidence, we determined that applicant had not demonstrated "a reasonable probability that its disclosure would have changed the jury's assessment of punishment." *Id.* at 325–26. We concluded that, because the jury acquitted applicant of the murder charges, which "suggests that the jury did not believe he was the shooter in any event," there was not a reasonable probability "that the jury would have assessed anything other than the fifty-five-year sentence that it actually did assess." *Id.* at 326. We also noted that Cameron and Lewis had both submitted sworn statements that they would testify again to the same effect. *Id.* We held that, under these circumstances, applicant could not show "by clear and convincing evidence that *no* reasonable juror would find he was the shooter in a retrial." *Id.*

### D. Unknowing Use of False Testimony is New Legal Basis in Present Case

██ The error standard we applied to applicant's claim in *Chavez I* was more difficult for an applicant to establish than the present standard now applicable to due-process claims of unknowing use of false testimony. *See Chabot,* 300 S.W.3d at 772; *Ex parte Ghahremani,* 332 S.W.3d 470, 478 (Tex.Crim.App.2011). The present standard for materiality of false testi-

mony is whether there is a "reasonable likelihood that the false testimony affected the applicant's" conviction or sentence. *Id.* This standard is "more likely to result in a finding of error" than the standard that requires the applicant to show a "reasonable probability" that the error "affected the outcome." *Id.* (discussing standard applied to *Brady*[7] claims of suppressed evidence). *Chavez I* analyzed whether there was a due-process violation by "borrow[ing] once again from the due-process vernacular in the context of the suppression of exculpatory punishment evidence" and determined that the record did not show "a reasonable probability that its disclosure would have changed the jury's assessment of punishment." *Chavez I*, 213 S.W.3d at 325–26. Because an applicant can more easily establish materiality after *Chabot*, applicant's subsequent application presents a new, previously unavailable legal basis. *See* TEX.CODE CRIM. PROC. art. 11.071, § 4(a)(1).

Furthermore, our opinion in *Chavez I* took into account factors not applicable to post-*Chabot* analysis of those claims. First, our consideration in *Chavez I* that the misinformation was in no way attributable to prosecutorial misconduct is no longer relevant to applicant's claim in light of *Chabot*, in which we found "no reason" for affording disparate treatment to claims in which the State lacked knowledge of testimony's falsity at the time of trial. *Chabot*, 300 S.W.3d at 771. Second, in *Chavez I*, we weighed applicant's complicity in the admission of the false testimony against a finding of error, observing that, in the failure-to-disclose context, there is no due-process violation when "the defendant himself already knew about the exculpatory facts." *Chavez I*, 213 S.W.3d at 325 (citing, *e.g.*, *Harris v. State*, 453 S.W.2d 838, 839 (Tex.Crim.App.1970) ("If

such [exculpatory] facts were known to the appellant or his trial counsel, he cannot now seek relief on the basis of the State's failure to disclose the same facts.")). However, nothing in our due-process false-testimony jurisprudence imposes upon a defendant a duty to incriminate himself in order to potentially avoid erroneous admission of false testimony as a prerequisite to relief.

Because this Court now recognizes a due-process claim of unknowing use of false testimony, and because the applicable standards are considerably more favorable than those we applied to applicant's initial false-testimony claim, applicant is entitled to review of his subsequent application. *See* TEX.CODE CRIM. PROC. art. 11.07, § 4(a)(1).

## III.  Merits of Applicant's False–Testimony Claim

### A.  Standard of Review

On postconviction review of habeas corpus applications, the convicting court is the "original factfinder," and this Court is the ultimate factfinder. *Ex parte Reed*, 271 S.W.3d 698, 727 (Tex.Crim.App. 2008). We generally defer to and accept the convicting court's findings of fact and conclusions of law when they are supported by the record. *Id.* However, "[w]hen our independent review of the record reveals that the trial judge's findings and conclusions are not supported by the record, we may exercise our authority to make contrary or alternative findings and conclusions." *Id.*

### B.  Analysis of Testimony by Cameron and Lewis

#### *1.  Was Cameron's and Lewis's testimony false?*

"The Due Process Cause of the Fourteenth Amendment can be violated

7.  *Brady v. Maryland*, 373 U.S. 83, 87, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963)

when the State uses false testimony to obtain a conviction, regardless of whether it does so knowingly or unknowingly." *Ex parte Robbins,* 360 S.W.3d 446, 459 (Tex. Crim.App.2011) (citing U.S. CONST. amend. XIV). Testimony need not be perjured to constitute a due-process violation; rather, "it is sufficient that the testimony was 'false.'" *Id.* The question is whether the testimony, taken as a whole, gives the jury a false impression. *See Ghahremani,* 332 S.W.3d at 477; *Alcorta v. Texas,* 355 U.S. 28, 31, 78 S.Ct. 103, 2 L.Ed.2d 9 (1957).

In rendering its findings, conclusions, and recommendation, the trial court focused on whether the testimony was perjured. It concluded that, because the evidence did not show that Cameron and Lewis "intended to provide false testimony or that they thought their trial testimony was inaccurate," applicant had failed to establish a due-process violation "based on the State's unknowing presentation of alleged perjured testimony." These findings, however, misapply the standard for false testimony because a witness's intent in providing false or inaccurate testimony and the State's intent in introducing that testimony are not relevant to false-testimony due-process error analysis. *See Robbins,* 360 S.W.3d at 459.

*Chavez I* focused on evidence that the roommates would testify again to the same facts. But this consideration is also no longer relevant and does not preclude a finding of error for due-process purposes. *See also Estrada v. State,* 313 S.W.3d 274, 287 (Tex.Crim.App.2010) (error where witness unintentionally provided "incorrect testimony"); *Townsend v. Burke,* 334 U.S. 736, 740–41, 68 S.Ct. 1252, 92 L.Ed. 1690 (1948) (sentence based on information that is "materially untrue ... whether caused by carelessness or design, is inconsistent with due process of law").

■ The record does show that the testimony, taken as a whole, gave the jury a false impression. *See Ghahremani,* 332 S.W.3d at 477; *Alcorta,* 355 U.S. at 31, 78 S.Ct. 103. In this case, it is undisputed that Cameron's and Lewis's unequivocal testimony that applicant was the shooter was false. This was demonstrated by the confession of the actual shooter, which was ultimately confirmed by the subsequent guilty plea and conviction of that individual. We also note that applicant described his involvement in the offense to his counsel before the culmination of the trial for this offense. Both the prosecution team and the trial courts (in the initial and subsequent habeas proceedings) have concluded that applicant was not the shooter and that Cameron's and Lewis's trial testimony to that effect was "incorrect." Applicant, therefore, satisfies the "falseness" prong of a false-testimony due-process claim.

### 2. Was the false testimony material?

To constitute a due-process violation, the record must show that the testimony was material, namely, that there is "a reasonable likelihood" that the false testimony affected the judgment of the jury. *See Ghahremani,* 332 S.W.3d at 478. In *Ghahremani,* the State introduced misleading testimony from the victims' father that "amplified the impact that the applicant's actions had on" the victims. *Id.* at 480. Observing that the applicant's sentences were at the high end of the applicable punishment range, we held that there was "a reasonable likelihood that the false testimony resulted in a harsher punishment" in that case. *Id.* In *Chabot,* we found that the false accomplice-witness testimony was also material because it provided the only direct evidence supporting the conviction. *See Chabot,* 300 S.W.3d at 772.

Here, applicant contends that the testimony was material, arguing that the jury would have assessed a lesser punishment had it not been misled by Cameron's and Lewis's false testimony to erroneously believe that applicant was in the house at the time of the shooting. We conclude that examination of the entire record does not reveal a reasonable likelihood that the jury was affected by the false testimony in assessing applicant's punishment. We first observe, as we did in *Chavez I*, that the jury's acquittal of applicant of the murder charges reveals that the jury disbelieved the witnesses' testimony that applicant was the triggerman. *Chavez I*, 213 S.W.3d at 325–26. Specifically, Cameron and Lewis testified that they observed only two of the intruders actually inside the home, both of whom were armed, but only one of whom met applicant's description. Therefore, if the jurors disbelieved Cameron's and Lewis's testimony that applicant was the assailant who shot Parisi, it is difficult to comprehend how they could have been otherwise misled by the witnesses' testimony as to the level or nature of applicant's involvement.

Furthermore, defense counsel impeached Cameron with prior inconsistent statements he had made, including having initially informed police that he "couldn't see who [the shooter] was" because he "had a mask on." There was also testimony that Cameron identified applicant only after discussing the offense with other witnesses and after an investigating officer had suggested applicant's name to him. This substantially weakened Cameron's testimony, and he was the sole witness who claimed to have seen applicant's face during the course of the offense.

We also observe that the record contains substantial incriminating circumstantial evidence that further supports our confidence in the fifty-five-year sentence. For example, James Hitchcock, applicant's neighbor, testified that, a few weeks before the offense, applicant told him that "he wanted to try to get in good with Alex [Parisi] and them" so that "if they did a kick-door [8] on him, they'd know where everything was." He further testified that, the day after the offense, he went to applicant's home and saw a distinctive-looking gun resembling one Parisi had owned. When he told applicant that Parisi had been killed, applicant said, "I don't care ... I'm trying to get some sleep." Furthermore, Lewis testified, and applicant confirmed, that applicant went to Parisi's home a few hours before the offense to buy drugs, and Lewis informed him that they had just received a large shipment of drugs that day. Lewis said that applicant was "looking around" the house during the transaction. Diann Hastings, who was at the home that evening, testified that four or five masked men entered the home, two of whom were armed. She and Chelsea Johnson, also at the house that evening, testified that as they fled, a man driving a truck, whom they believed was with the intruders, followed them as they sought refuge in a neighbor's house. Given this testimony, we do not find that the record reveals a reasonable likelihood that the jury would have assessed a different punishment even if they had believed applicant had entered the home rather than merely remained in the getaway truck.[9]

8. The record reveals that a "kick-door" is slang for a home-invasion robbery.

9. The record also contains the testimony of Jesse Arispe, a friend of applicant, who testified that applicant confessed to Arispe his role in the offense. Applicant successfully challenged this testimony on direct appeal. *See Chavez v. State*, No. 14–98–00696–CR, 2000 Tex.App. LEXIS 3055 (Tex.App.—Houston [14th Dist.] May 11, 2000) (not designated for publication). We do not review the propriety of court of appeals's holding, but find that,

Finally, the inculpatory evidence introduced at punishment revealed applicant's history of violent criminal behavior. The jury heard evidence that applicant was regularly engaged in dealing and using drugs, had dropped out of school, and had been convicted on an unlawful-weapons charge. Even more damning was detailed evidence that, while on bond awaiting trial for capital murder, applicant was charged with forgery and possession of cocaine. The jury was also aware, and the State emphasized in its closing argument, that applicant had lied on the witness stand by denying any involvement in the offense, which suggested that he lacked remorse and was interested only in avoiding punishment, despite his key role in a crime that directly resulted in someone's death. It was only after he had heard the weight of the State's punishment evidence that he attempted to negotiate with the State in hopes of obtaining a reduced sentence.

In light of the entire record before us, we find that the evidence fails to show a reasonable likelihood that the false testimony affected applicant's sentence. *See Ghahremani,* 332 S.W.3d at 481. Because we conclude that applicant has failed to establish a due-process violation, we need not decide whether applicant has shown, by a preponderance of the evidence, that the error contributed to his punishment. *See Fierro,* 934 S.W.2d at 377; *Chabot,* 300 S.W.3d at 771; *Ghahremani,* 332 S.W.3d at 481. His sole issue is overruled.

## IV. Conclusion

Because applicant has established that there is a new, previously unavailable legal basis for the relief he seeks, we have considered the merits of this subsequent application. Applicant has failed, however, to establish a due-process violation by the unknowing use of false testimony. We, therefore, deny relief.

WOMACK, J., filed a concurring opinion in which HERVEY, J., joined.

KELLER, P.J., filed a dissenting opinion.

PRICE, J., filed a dissenting opinion in which KEASLER, J., joined.

WOMACK, J., concurring in which HERVEY, J., joined.

I join the opinion of the Court. I write separately to address a matter that is raised in the Presiding Judge's dissenting opinion.

That opinion, in discussing the various standards of review we apply to false testimony claims, says that "it is possible" that a different standard of review would apply if the testimony at issue were merely "false" (as distinguished from "perjured"). The opinion suggests that the standard of review we would apply might vary with the moral culpability of the witness: "When the testimony is perjured, a non-state actor has knowingly subverted the system, but when the testimony is merely false, the relevant actors may have been merely negligent or have no culpability at all."[1]

I believe our recent opinion in *Ex parte Ghahremani*[2] definitively answered the question of whether there is a difference, for purposes of a due-process claim, between perjured testimony and false testimony. In that case, the State knowingly presented false testimony regarding the psychological effect that the applicant's crime had had on one of the victims. The

---

even absent Arispe's testimony, the record does not support a finding that the false testimony was material.

1. *Post,* at 216.

2. 332 S.W.3d 470 (Tex.Cr.App.2011).

victim's parents had testified in a way that was not perjurious, but that created a false impression by omitting important intervening events that occurred between the applicant's crime and the victim's most intensive therapy. We held that, for the purpose of due-process claims, there was no difference between "false" and "perjured" testimony: "It is sufficient if the witness's testimony gives the trier of fact a false impression. These rules are not aimed at preventing the crime of perjury—which is punishable in its own right—but are designed to ensure that the defendant is convicted and sentenced on truthful testimony." [3]

Distinguishing whether the testimony at an applicant's trial was perjured or false does not bear on the question of whether the applicant was convicted and sentenced on truthful testimony. While the facts of *Ghahremani* did not involve the precise sort of case that the Presiding Judge imagines—where the State has unknowingly used false but non-perjurious testimony—I see no reason why the rule we established in *Ghahremani* would apply differently to such facts.

In *Estrada v. State*,[4] the State unknowingly used false testimony, without any accusation of perjury. We granted relief after noting that there was a "fair probability" that the testimony affected the outcome of the appellant's punishment hearing. That standard is easier to meet than the "preponderance of the evidence" standard we applied to the State's unknowing use of perjured testimony in *Ex parte Chabot*.[5] "Fair probability" seems similar to the "reasonable probability" standard that we applied to the State's knowing use of false but non-perjured testimony in *Ghahremani*. However, *Estrada* was a death penalty case, and in our holding we cited Supreme Court cases interpreting both the Due Process Clause and the Eighth Amendment. It may be that the Eighth Amendment has a heightened truth requirement for evidence presented at the punishment phase of a death penalty case.

As the Presiding Judge's otherwise excellent discourse on the standards of review in false testimony cases makes clear, the only way the distinction between false and perjured testimony could be relevant in a non-death-penalty case would be where (1) the State unknowingly presented false, but not perjured, testimony, and (2) the applicant can prove, by a preponderance of the evidence, that, but for the false-but-not-perjured testimony, the result of his trial would have been different, but (3) the applicant cannot meet a higher burden of proof ("by clear and convincing evidence," or "beyond a reasonable doubt," I suppose) to show that, but for the false-but-not-perjured testimony, the result of his trial would have been different. Leav-

---

3. *Id.*, at 477–78 (quotations and citations omitted). *See also United States v. Boyd*, 55 F.3d 239, 243 (7th Cir.1995) (Posner, J.) ("The wrong of knowing use by prosecutors of perjured testimony does not require a determination that the witness could have been successfully prosecuted [for perjury]. Successful prosecution would require proof beyond a reasonable doubt not only that the witness's testimony had been false but also that it had been knowingly false (and hence perjury). The wrong of knowing use by prosecutors of perjured testimony is different, and misnamed—it is knowing use of *false* testimo-

ny. It is enough that the jury was likely to understand the witness to have said something that was, as the prosecution knew, false.... [This] is implicit in the frequent use of 'false' as a synonym for 'perjured' in cases in which prosecutors are claimed to have knowingly used perjured testimony. *E.g., United States v. Agurs*, 427 U.S. 97, 103, 96 S.Ct. 2392, 49 L.Ed.2d 342 (1976) ....").

4. 313 S.W.3d 274 (Tex.Cr.App.2010).

5. 300 S.W.3d 768 (Tex.Cr.App.2009).

ing aside our holding in *Ghahremani*, I have difficulty imagining any court's specifically carving out a rule in order to let such a conviction stand.

KELLER, P.J., dissenting.

I agree with the Court and with Judge Price that applicant's claim must fail. I dissent because I believe that the claim should be dismissed rather than denied on the merits. I also write separately to review the differences in the ways that we treat claims, depending on whether testimony is perjured or merely false, and whether the State knew or did not know of that fact.

### A. Procedural Question: Dismiss or Deny?

Under § 4, we cannot consider the merits of a subsequent habeas application unless one of two exceptions is satisfied.[1] The Court holds that applicant has satisfied the "unavailability" exception found in § 4(a)(1) because our decision in *Ex parte Chabot*[2] constitutes a new legal basis that did not exist when applicant's first habeas application was filed. I cannot agree.

For a "new legal basis" to satisfy the statutory unavailability exception, it must be true that "the current claims and issues have not been and could not have been presented previously in an original application ... filed under this article because the ... legal basis for the claim was unavailable on the date the applicant filed the previous application."[3] Applicant's claim fails under both the "have not been" and the "could not have been" aspects of the unavailability exception.

The legislature has specifically defined what constitutes an "unavailable" legal basis:

> For purposes of Subsection (a)(1), a legal basis of a claim is unavailable on or before a date described by Subsection (a)(1) if the legal basis was not recognized by and *could not have been reasonably formulated from* a final decision of the United States Supreme Court, *a court of appeals of the United States,* or a court of appellate jurisdiction of this state on or before that date.[4]

The statute is not satisfied by the mere fact that we have never recognized the legal basis in question. Habeas applicants are responsible for knowing, not only about decisions from this Court and the United States Supreme Court, but also about the decisions of the Texas Supreme Court, Texas courts of appeals, and United States courts of appeals. If any of those courts have recognized the legal basis, or issued a decision from which the legal basis could have been reasonably formulated, then the unavailability exception is not met.[5]

*Sanders v. Sullivan* is a case from a United States court of appeals that is not exactly on point, but I believe that applicant's claim could reasonably have been formulated from it.[6] In that case, the Second Circuit recognized that a due-process violation could be shown through the

---

1. Tex.Code Crim. Proc. art. 11.07, § 4(a).

2. 300 S.W.3d 768 (Tex.Crim.App.2009).

3. Art. 11.07, § 4(a)(1).

4. *Id.*, § 4(b) (emphasis added).

5. *See also Ex parte Hood*, 211 S.W.3d 767, 775 (Tex.Crim.App.2007), *disposition changed*

on reh'g, 304 S.W.3d 397 (Tex.Crim.App. 2010). The statute does not make habeas applicants responsible for knowing the decision of state appellate courts from other states, e.g. the Supreme Court of California.

6. 863 F.2d 218 (2d Cir.1988).

State's *unknowing* use of perjured testimony:

> In our view however, it is indeed another matter when a credible recantation of the testimony in question would most likely change the outcome of the trial and a state leaves the conviction in place. In this case, we believe that allowing the conviction to stand violates due process.[7]
>
> *  *  *
>
> There is no logical reason to limit a due process violation to state action defined as prosecutorial knowledge of perjured testimony or even false testimony by witnesses with some affiliation with a government agency. Such a rule elevates form over substance. It has long been axiomatic that due process requires us "to observe that fundamental fairness essential to the very concept of justice." It is simply intolerable in our view that under no circumstance will due process be violated if a state allows an innocent person to remain incarcerated on the basis of lies.[8]

*Sanders* was concerned with perjured testimony. It did not hold that the State's unknowing use of false, but not perjured, testimony could violate due process. But neither did *Chabot*, which also involved only perjured testimony, and which applicant relies on today as a "new legal basis."[9] *Chabot* was decided after applicant's first habeas application, but *Sanders* was decided before it. If, before his first application, applicant could have reasonably formulated a claim that due process could be violated by the State's unknowing use of false (not perjured) testimony, he fails to establish a new legal basis for his claim.[10] I believe that applicant could have formulated this claim from *Sanders*. And this belief is vindicated by the fact that he actually did formulate it: he raised it in his first application.

This brings us to the reason applicant's claim fails the other aspect of the unavailability exception: he has actually already presented the claim. The unavailability exception is met only by claims that "have not been and could not have been presented previously." Because applicant presented his claim previously, it does not fall within the unavailability exception.

By raising his claim in his original application, applicant gains an advantage compared to the litigant who fails to do so: there is always the possibility that this Court will reconsider a previous application.[11] Although reconsideration should be

7.  *Id.* at 222 (citations omitted).

8.  *Id.* at 224 (citation omitted).

9.  *See Chabot*, 300 S.W.3d at 772 ("[W]e agree with the convicting court that the circumstances of the present case merit a finding that the applicant's due-process rights were violated, notwithstanding the absence of the State's knowledge of the perjured testimony at the time of trial.").

10.  *See Ex parte Fontenot*, 3 S.W.3d 32 (Tex. Crim.App.1999) (Even though cases of *Ex parte Jarrett*, 891 S.W.2d 935 (Tex.Crim.App. 1994), and *Ex parte Wilson*, 956 S.W.2d 25 (Tex.Crim.App.1997), recognizing an ineffective-assistance claim arising out counsel's failure to tell a defendant of his right to file a

PDR on his own, had not yet been decided when applicant's initial application was filed, the claim could have been reasonably formulated from statement in *Ayala v. State*, 633 S.W.2d 526 (Tex.Crim.App.1982), that an ineffective-assistance claim could arise if the defendant was deprived of the right to file a PDR because counsel volunteered to file one but failed to do so.).

11.  A motion for rehearing from an order denying relief in an Article 11.07 habeas proceeding is not allowed, but we may reconsider the case on our own initiative. TEX.R.APP. P. 79.2(d); *see also Ex parte Moreno*, 245 S.W.3d 419, 427–29 (Tex.Crim.App.2008).

a rare event,[12] it ought to be available for a false-testimony claim that has been diligently pursued and would be meritorious under the Court's current standards.[13] I agree, however, for the reasons given by the Court, that applicant cannot establish materiality, so a reconsideration of the previous application is not warranted.

It is worth pointing out that applicant essentially receives a merits review of his claim in all three of the opinions issued in this case: from the Court in denying his application, from Judge Price in concluding that applicant fails to satisfy § 4, and from me in concluding that reconsideration of applicant's original application is not warranted. But how that review occurs is important because what this Court says here may impact future cases.[14] We should not suggest that applicants who have failed to diligently pursue false-testimony claims have satisfied the legislative scheme set out in § 4. The legislature made habeas applicants responsible for what happens in the federal appellate courts, not only for express holdings, but for legal theories that could be reasonably formulated from those holdings. We must give effect to the statute as it is written.[15]

## B. False–Testimony Jurisprudence

The general harm standard on habeas is that an applicant will be granted relief if

he can show, by a preponderance of the evidence, that the error or misconduct affected the outcome of the proceedings.[16] It is perhaps time to recognize that the application of the general harm standard on habeas corpus will be an exceedingly rare event.

I have not found a case since *Fierro* in which the preponderance standard has been applied. It has become apparent from our caselaw that the habeas harm standard applies only to claims that could have been raised in an earlier proceeding.[17] The preponderance standard does not apply, for example, to ineffective-assistance-of-counsel claims, which usually cannot be raised before habeas. And the preponderance standard does not apply to a claim about the knowing use of perjury when the defendant had no opportunity before habeas to discover and challenge the perjury.[18] Applicants like these, who are not responsible for failing to raise their claims earlier, are generally allowed a more favorable harm standard than the preponderance standard.

In his dissent in *Fierro*, Judge Clinton anticipated the main reason the general habeas harm standard rarely comes into play—the narrowing of the cognizability of claims to exclude most claims that could have been raised in an earlier proceeding.[19]

---

12. See *Moreno*, 245 S.W.3d at 427–29; see also id. at 431–32 (Keller, P.J., concurring).

13. *Id.* at 429 (reconsideration warranted, in part, because defendant had not "slumbered on his rights").

14. See *Ex parte Hood*, 304 S.W.3d 397, 409 (Tex.Crim.App.2010) (subsequent writ holding guided by desire to treat the applicant the same as similarly situated applicants in prior cases).

15. *Ex parte Smith*, 977 S.W.2d 610, 611 (Tex. Crim.App.1998).

16. *Ex parte Dutchover*, 779 S.W.2d 76, 78 (Tex.Crim.App.1989); *Ex parte Fierro*, 934 S.W.2d 370, 372 (Tex.Crim.App.1996).

17. See *Ex parte Ghahremani*, 332 S.W.3d 470, 481–83 (Tex.Crim.App.2011); *Fierro*, 934 S.W.2d at 374 n. 10.

18. *Ghahremani*, 332 S.W.3d at 481–83.

19. See *Fierro*, 934 S.W.2d at 378 (Clinton, J., dissenting) (would limit cognizability of habeas review to claims that are "so fundamental to the fair operation of the system as to be 1) immune from procedural default, 2) not subject to a harm analysis, and 3) fully retroac-

We now almost universally apply the rule that a claim is not cognizable on habeas corpus if it could have been raised at trial or on direct appeal.[20] The upshot is that the general habeas harm standard applies only to a claim that could have been raised earlier, but if a claim could have been raised earlier, then it is most likely not cognizable anyway.[21]

The knowing use of perjured or false testimony is a rare exception to the rule against considering claims on habeas that could have been raised earlier. It is appropriate to make this exception because of the egregiousness of the State's conduct. When the State knowingly subverts the system, a defendant's negligence in failing to assert a claim should not by itself end the analysis. Instead, a belated claim of this sort is subject to the general habeas harm standard.[22]

But some confusion has arisen in our perjury/false-testimony jurisprudence because of the failure to properly distinguish the harm and materiality analyses. *Chabot* involved the unknowing use of perjured testimony. In that case, we applied the preponderance standard to determine that relief was warranted. We characterized our application of the preponderance standard as a standard of harm,[23] but it was not: Chabot could not have raised his claim earlier,[24] so the general habeas harm standard did not apply.[25] What we actually did was perform a materiality analysis. As it happens, the materiality standard for the unknowing use of perjured testimony is the same as the general habeas harm standard.[26] Though it appeared that we were simply applying the preponderance standard, we were in fact analyzing the perjured testimony for materiality.

tive in application" and to those federal constitutional claims "recognized as of the time of trial but for which a record could not have been made, despite due diligence of the accused, in time to preserve the error for direct appeal").

**20.** *Ex parte Jimenez*, 364 S.W.3d 866, 880 (Tex.Crim.App.2012) ("Ordinarily a convicted person may not raise an issue in a habeas proceeding if the applicant could have raised that issue on direct appeal."); *Ex parte Richardson*, 201 S.W.3d 712, 713 (Tex.Crim.App. 2006) ("Nevertheless, the trend of this Court has been to draw stricter boundaries regarding what claims may be advanced on habeas. We have often stated that 'the Great Writ should not be used' to litigate matters 'which should have been raised on appeal' or at trial, and while we have not always consistently followed this maxim in the past, in recent years we have more closely adhered to it.").

**21.** In most cases, the failure to raise a claim that could have been raised earlier can be made a part of an ineffective-assistance-of-counsel claim. The prejudice standard for ineffective-assistance claims—a reasonable probability that the result of the proceeding would have been different—is slightly more favorable to the defendant than the general

habeas harm standard. *See Harrington v. Richter,* —— U.S. ——, 131 S.Ct. 770, 792, 178 L.Ed.2d 624 (2011); *Strickland v. Washington,* 466 U.S. 668, 694, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). But there will be rare cases in which an ineffective-assistance claim will be unavailable because the defendant represented himself at trial or on appeal.

**22.** *See Fierro, passim.*

**23.** 300 S.W.3d at 771.

**24.** *See id.* at 770 ("The applicant did not raise this due-process claim in his first application for habeas relief. Nor could he have brought the claim.").

**25.** *See Ghahremani,* 332 S.W.3d at 481–83.

**26.** *See Ex parte Napper,* 322 S.W.3d 202, 242 (Tex.Crim.App.2010) ("*Chabot* does not appear to have taken into account the caveat in *Fierro,* and so *Chabot* simply stands for the proposition that the preponderance of the evidence standard is appropriate for the unknowing use of perjured testimony that the habeas applicant had no prior opportunity to discover.").

That leaves at least two unanswered questions regarding claims about the unknowing use of false testimony. The first is whether a defendant may raise such a claim for the first time on habeas if he had an opportunity to raise the claim at a prior proceeding. I submit that when the State's use of perjured or false testimony is unknowing, a defendant may not raise his claim for the first time on habeas if he could have raised it at trial or on direct appeal. It is only the State's mendacity in the "knowing use" scenario that impels us to make an exception to the general rule against the cognizability of claims that could have been raised earlier.

The second unanswered question is whether the materiality standard that applies to the unknowing use of perjured testimony should also apply to the unknowing use of testimony that is merely false. We do not distinguish between perjured and false testimony in the "knowing use" context because the materiality standard depends upon the culpability of the state actor that uses the testimony, and state actor who knowingly uses false testimony is just as culpable as one who knowingly uses perjured testimony. But in the "unknowing use" context, the culpability of the state actor is not the main issue, if it is an issue at all. When the testimony is perjured, a non-state actor has knowingly subverted the system, but when the testimony is merely false, the relevant actors may have been merely negligent or have no culpability at all. All we can say with certainty is that the showing of materiality for the unknowing use of testimony that is

merely false must be at least as strong as the showing required for the unknowing use of perjured testimony,[27] but it is possible that, when perjury is absent, an even stronger showing is required.

Regardless of the answer to that second question, our cases have resulted in a "materiality ladder" in which claims can be arranged in order of how favorable the standard of materiality is to the defendant. Claims regarding the State's knowing use of perjured or false testimony occupy one end of the ladder with the most favorable standard of materiality—a reasonable possibility that the outcome would be different (not harmless beyond a reasonable doubt).[28] Claims regarding newly discovered evidence that demonstrates a convicted person's innocence occupy the other end of the ladder, with the least favorable standard of materiality—clear and convincing evidence that no reasonable juror would have convicted the defendant in light of the new evidence.[29] The unknowing use of perjured or false testimony falls in between those endpoints, with a mid-level standard (or standards) of materiality.[30]

For these reasons, I disagree with some statements in the Court's opinion that suggest that the materiality standard for the "unknowing" use of false testimony is the "reasonable possibility" standard associated with "knowing" use. The materiality standards for knowing and unknowing use are in fact distinct. The following chart summarizes the main differences between

---

27. *Id.* at 244.

28. *United States v. Bagley*, 473 U.S. 667, 678–80, 679 n. 9, 105 S.Ct. 3375, 87 L.Ed.2d 481 (1985).

29. *Ex parte Elizondo*, 947 S.W.2d 202, 209 (Tex.Crim.App.1996).

30. Although *Elizondo* was decided as an actual innocence case, it would also have satisfied the predicate, under today's standards, for an unknowing-use-of-perjured-testimony claim because the recantation of a testifying witness was at issue. *See id.* at 204 ("[L]ast year, the witness whose testimony was mainly responsible for convicting applicant recanted.").

the various types of claims that can involve perjured or false testimony:

| The Situation | Materiality Standard | Compared to Habeas Harm Standard | Forfeit if claim could have been but was not raised at trial or on direct appeal? |
|---|---|---|---|
| State's knowing use of perjured or false testimony | Reasonable possibility that the outcome would have been different (not harmless beyond a reasonable doubt) (*Bagley*) | Substantially more favorable to the defendant than the habeas harm standard | No, but if raised late, habeas harm standard applies |
| Ineffective assistance of counsel (for failing to discover or expose perjured or false testimony) | Reasonable probability that outcome would have been different (*Strickland*) | Slightly more favorable to the defendant than the habeas harm standard | Yes (but rare that claim could have been raised earlier) |
| State's unknowing use of perjured testimony | Preponderance of the evidence (more likely than not) that the outcome would have been different (*Chabot*) | Same as the habeas harm standard | Yes |
| State's unknowing use of false (but not perjured) testimony | At least preponderance but possibly heavier burden | At least as onerous to the defendant as the habeas harm standard but possibly more onerous | Yes |
| Newly discovered or newly available evidence that establishes the defendant's actual innocence | Clear and convincing evidence that no rational juror could find the defendant guilty beyond a reasonable doubt (*Elizondo*) | Substantially more onerous to the defendant than the habeas harm standard | Yes, if the evidence would not qualify as "newly discovered" or "newly available" |

With these comments, I agree with the Court's conclusion that applicant's claim must fail. Because I would dismiss the application, rather than deny it, I respectfully dissent.

PRICE, J., dissenting in which KEASLER, J., joined.

This is a subsequent application for writ of habeas corpus brought under the auspices of Article 11.07, Section 4(a)(1) and (b) of the Texas Code of Criminal Procedure.[1] Today the Court issues an opinion denying the applicant relief on the merits of his claim. I do not disagree that the applicant is not entitled to relief on the merits, but I would dismiss the applicant's writ application as abusive rather than deny him relief on the merits. I therefore respectfully dissent.

*I.*

We filed and set the applicant's initial application for writ of habeas corpus six

1. TEX.CODE CRIM. PROC. art. 11.07, § 4(a)(1) ("If a subsequent application for writ of habeas corpus is filed after final disposition of an initial application challenging the same conviction, a court may not consider the merits of or grant relief based on the subsequent application unless the application contains sufficient specific facts establishing that [*inter alia*] ... the current claims and issues have not been and could not have been presented previously in an original application or in a previously considered application filed under this article because the ... legal basis for the claim was unavailable on the date the applicant filed the previous application[.]"); *id.* § 4(b) ("For purposes of Subsection (a)(1), a legal basis of a claim is unavailable on or before a date described by Subsection (a)(1) if the legal basis was not recognized by and could not have been reasonably formulated from a final decision of the United States Supreme Court, a court of appeals of the United States, or a court of appellate jurisdiction of this state on or before that date.").

years ago and wrote an opinion that denied him relief.[2] In that opinion, we explicitly addressed only one of the claims that the applicant had raised, and denied the remaining claims without specifically addressing them.[3] In the claim that we expressly addressed, the applicant argued that he was entitled to a new punishment proceeding on the basis of new evidence that had come to light demonstrating that he was "actually innocent" of the fifty-five year sentence that had been imposed. In his subsequent writ application, the applicant now relies upon the same facts that fueled his initial writ application. It is no surprise, therefore, that he does not try to justify our review of the merits of his present claim on the basis of newly available *facts*. Instead, he argues that this Court has made new *law* since we rejected his initial writ application and that this new law renders his present claim newly available under Section 4(a)(1). Because we are not authorized to "consider the merits" of "claims and issues" in a subsequent writ application that do not meet the criteria of Section 4(a)(1), however, and because I conclude that the applicant ultimately fails to meet those criteria, I would dismiss the present writ application rather than deny it.

## II.

The facts as we recited them in our opinion on the applicant's initial writ application are as follows:

The applicant was indicted and tried for capital murder, but convicted of the lesser offense of aggravated robbery, and sentenced to fifty-five years in prison. His conviction was affirmed on direct appeal. The case involved the home invasion of a drug dealer, who was fatally shot during the course of the incident.

Two witnesses who were present testified at trial that the applicant was the shooter. One claimed that he recognized the applicant when, at one point, the applicant pulled down the bandana that had been covering his face. The other identified the applicant because he claimed to · recognize the applicant's voice and his physique. The applicant testified to an alibi, but he was unable to produce any corroborating witnesses.

While the jury was out deliberating the applicant's guilt or innocence, the applicant informed his trial counsel for the first time that he had indeed been involved in the robbery, but only as the wheel-man rather than one of the home-invaders. He denied being the shooter. At the applicant's request, his trial counsel arranged a meeting with the prosecutor so that they could convey this information to her. Before the applicant and his counsel could conclude their meeting with the prosecutor, however, the jury returned its verdict of guilty. Later, after the jury returned its punishment verdict and the trial court pronounced sentence, the applicant's trial counsel conducted an informal colloquy on the record with the applicant to establish these facts.

In the course of its subsequent investigation, the State identified other witnesses, previously unknown to the State, who could testify that two other individuals had admitted to perpetrating the home invasion, one of whom was the actual shooter in the case rather than the applicant. Both of those individuals were subsequently charged with, and pled guilty to, aggravated robbery, and each was assessed a thirty-year sentence. Even so, both of the witnesses

---

2.  *Ex parte Chavez,* 213 S.W.3d 320 (Tex.Crim. App.2006).

3.  *Id.* at 326 n. 30.

who originally identified the applicant as the shooter in the case have submitted affidavits in which they assert that they still believe, based upon their perceptions of the event, that the applicant is the one they saw kill the drug dealer, and that they would testify again to that effect. The prosecutor at the applicant's trial has also submitted an affidavit in which she asserts that at the time of trial, she had no knowledge of any evidence that the applicant was *not* the shooter, and no reason to disbelieve or distrust the witnesses who testified against him at his trial.[4]

In his initial writ application, the applicant claimed that the newly discovered evidence that he was not one of the principal actors in the offense constituted evidence that he was "actually innocent" of the fifty-five year punishment he received.

Among the reasons we gave for rejecting this claim, we observed that the newly discovered evidence was not "material" to the jury's assessment of punishment:

> That the jury acquitted the applicant of capital murder and murder suggests that the jurors did not believe he was the shooter in any event; otherwise, they would not have had any rational basis to acquit him of the homicide offenses but still convict him (presumably as a party) of aggravated robbery. Because it appears that the jury in its capacity as the sentencing entity did not believe the applicant was the shooter in any event, we do not believe there is a reasonable probability—that is to say, a

probability sufficient to undermine our confidence in the outcome—that the jury would have assessed anything other than the fifty-five-year sentence that it actually did assess.[5]

The applicant now argues that the same turn of events that he initially invoked in support of his claim of "actual innocence" of a fifty-five year sentence will now support a claim that his conviction violated federal due process because it was predicated upon false evidence. Such a claim is available to him now, he maintains, because, since we denied relief in his initial writ application back in 2006, we have held for the first time, in *Ex parte Chabot*,[6] that the State's inadvertent use of false evidence to obtain a conviction may, if that false evidence should prove material, violate due process.

### III.

Does our opinion in *Chabot* provide a legal basis for relief that was previously unavailable law in contemplation of Article 11.07, Section 4(b)? Could our holding there "have been reasonably formulated from" a final decision of an appellate court as of the date that the applicant filed his initial writ application?[7] I am not certain. But, ultimately, I do not think it matters in this case. For we have all but held that it is enough to declare a subsequent Article 11.07 habeas application abusive, under Section 4(a)(1), if it fails to allege facts sufficient to bring the applicant within the ambit of his asserted new legal basis for relief.[8] In other words, an applicant fails

---

4. *Id.* at 321–22 (footnote omitted).

5. *Id.* at 326 (footnote omitted).

6. 300 S.W.3d 768 (Tex.Crim.App.2009).

7. Tex.Code Crim. Proc. art. 11.07, § 4(b).

8. *See Ex parte Brooks*, 219 S.W.3d 396, 400–01 (Tex.Crim.App.2007) (holding that a non-

capital subsequent habeas application was abusive under Article 11.07, Section 4(a)(2) because it did not establish a prima facie case for threshold actual innocence). *Cf. Ex parte Campbell*, 226 S.W.3d 418, 421 (Tex.Crim. App.2007) ("[T]o satisfy Art. 11.071, § 5(a) [the capital analog to Article 11.07, Section 4(a)(1)], 1) the factual or legal basis for an applicant's current claims must have been

to satisfy Section 4(1)(a), not only by failing to identify genuinely novel law, but also (and independently) by failing to allege facts that make out a prima facie case for relief even under the novel law he purports to identify.[9] A subsequent writ application that is deficient in this latter regard should be dismissed rather than denied.[10]

Even on the face of it, the applicant cannot bring himself within the ambit of *Chabot*. This is so for the same reason we

announced, in his initial writ, that he could not establish a due process violation at the punishment phase of his trial—a manifest lack of materiality. Assuming that the witnesses who identified the applicant as the shooter at his trial testified "falsely," [11] that falsehood clearly had no impact on the deliberative process of the jurors, who in any event almost certainly did not believe those witnesses—otherwise, the jury would have had no rational basis to acquit the applicant of capital murder and murder,

unavailable as to all of his previous applications; and 2) the specific facts alleged, if established, would constitute a constitutional violation that would likely require relief from either the conviction or sentence." (footnote omitted)); *Ex parte Staley*, 160 S.W.3d 56, 63 (Tex.Crim.App.2005) ("Under both Article 11.07 and Article 11.071, ... it is not sufficient to allege that a legal claim was unavailable at the time of the applicant's original filing if the facts alleged in the subsequent application do not bring the constitutional claim under the umbrella of that 'new' legal claim.").

9. In *Rocha v. Thaler*, the Fifth Circuit has observed:

> One feature of the CCA's decision in [*Ex parte*] *Campbell* warrants particular attention. *Campbell* establishes that the requirements of § 5(a)(1) [of Article 11.071, and therefore, one would think analogically, of Article 11.07, § 4(a)(1)] should be applied sequentially. The CCA first examines whether the factual or legal basis of the claim was unavailable at the time of the original application. Only if the applicant can surmount the unavailability hurdle does the CCA proceed to ask whether the application makes out a claim that is prima facie meritorious.

626 F.3d 815, 834 (5th Cir.2010) (opinion on panel reh'g) (footnote omitted). With all due respect to Judge Higginbotham, I disagree with his reading of our opinion in *Campbell*. It is true that in *Campbell* itself we first asked whether Campbell had identified new law and only *then* asked whether he had established a prima facie case for facts that would bring him within that new law. But conducting the analysis in this order in *Campbell* did not amount to an express holding that a statutory

abuse-of-the-writ analysis can proceed *only* in this sequence. As far as I am concerned, we should dismiss a subsequent writ as abusive if it fails to satisfy *either* the new-law *or* the prima facie statement of facts aspect of the pleading requirement; we should not necessarily have to conduct *both* analyses. *Cf. Strickland v. Washington*, 466 U.S. 668, 697, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984) (if federal habeas applicant fails to satisfy either the deficiency prong or the prejudice prong of the Sixth Amendment ineffective assistance of counsel claim, a reviewing court may deny relief; it is not necessary under those circumstances to undertake both inquiries, much less undertake them in any particular order). I do not think we bound ourselves to any particular sequence in *Campbell*.

10. In *Brooks*, *Campbell*, and *Staley*, all *supra*, we dismissed the applications as abusive. *See also Ex parte Alba*, 256 S.W.3d 682, 691 (Tex. Crim.App.2008) (Cochran, J., concurring) ("In the context of an Article 11.071 subsequent writ application, an applicant fails to surmount the Section 5 procedural bar to allow for the considerations of the merits of a subsequent claim if he fails to make a prima facie showing of a constitutional violation. This is a state-law procedural bar that the Legislature has enacted and that this Court must enforce. In those cases, we dismiss the subsequent application without returning it to the trial court to make factual findings because we have already determined that the applicant has not pled sufficient facts that, even if proven, could support relief.")

11. Those witnesses have apparently never recanted, however, even to this day. *Chavez*, *supra*, at 326.

but convict him (presumably as a party) of aggravated robbery. On this state of the record, whatever standard of materiality may apply,[12] the applicant cannot possibly clear it. I would hold, therefore, that the applicant cannot make a prima facie case of false *material* evidence; he thus cannot take advantage of our holding in *Chabot* even if it is newly available as to him.

Because I believe the Court lacks authority to rule on the merits of the present subsequent writ application, I dissent to its order denying relief on the merits. I would dismiss the application as abusive.[13]

12. *See Ex parte Napper*, 322 S.W.3d 202, 241–44 (Tex.Crim.App.2010) (discussing various standards of materiality application of which depends upon whether trial testimony was perjurious or false and whether applicant had an opportunity to complain about it on direct appeal).

13. Either way, of course, the applicant obtains no habeas corpus relief in state court. Nevertheless, I presume that either way the federal courts will deem themselves able to consider the merits of the applicant's present claim in any later federal petition for writ of habeas corpus (any writ that is not *itself* abusive, under the terms of 28 U.S.C. § 2244(b)). An order dismissing a subsequent state habeas corpus application under Article 11.07, Section 4(a)(1), that is expressly predicated upon the failure of that subsequent application to establish a prima facie case will not be considered by the Fifth Circuit to derive from an adequate and independent state law ground, and thus, subject to federal review on the merits. *Ruiz v. Quarterman*, 504 F.3d 523, 527–28 (5th Cir.2007); *Balentine v. Thaler*, 626 F.3d 842, 853 (5th Cir.2010) (opinion on panel reh'g); *Rocha, supra*, at 835.